**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| QUINTON M. THOMAS; ROELIF EARL CARTER; BRADLEY JILES; ANGELA DAVIS; MEREDITH WALKER; BRITTANY ELLIS; DONYA PIERCE; MAWOUSSIME ADOBOE ; VERONICA MURPHY; CHARLES RILEY, et al., | ) ) ) ) ) ) ) ) ) Case No. 4:18-cv-01699 |
| Plaintiffs, | ) ) ) |
| v. | ) (Jury Trial Demanded) ) |
| CITY OF ST. ANN, | ) ) |
| Defendant. | ) ) |

**SECOND AMENDED CLASS ACTION COMPLAINT**

**INTRODUCTION**

1.      The City of St. Ann, through its police department, municipal court system, prosecuting attorney's office, and jail, has terrorized the named Plaintiffs and many thousands of others through a deliberate policy established and implemented to fill the city's coffers by extorting money from thousands of poor, disproportionately African-American people in the St. Louis region, creating a squalid debtors' prison scheme that has no place in American society.

2.      The scheme reflects an extraordinary abuse of governmental authority, starting with the over-policing of low-income communities of color and the issuance of excessive citations for traffic and other minor municipal code violations, followed by arbitrary fines, penalties, surcharges, and interest charges that pile up like debts to a loan-shark, arrest warrants auto-generated without good cause or even a semblance of due process, and imprisonment—

imposed without assistance of counsel—in squalid debtors' prisons.  This unconstitutional revenue-generation scheme disproportionately targets African-American residents, detaining them under abominable conditions, thereby placing jobs at risk, leaving children without supervision, and debasing fundamental human rights, for as long as it takes to strong-arm payment from Plaintiffs and others.

3.     Plaintiffs are a group of similarly situated individuals who are victims of this predatory scheme.  Each of these human beings was locked in a cell in the City of St. Ann solely because he or she was unable to afford a cash payment.  And each was left to languish in filthy, often overcrowded jail cells because he or she could not afford to pay jacked-up fines, penalties, and other charges.  Defendant did not inquire about, much less accommodate, the hardships its extortionate demands and harsh prison conditions placed on Plaintiffs and their families.  To the contrary, Defendant essentially rented space in its overcrowded prison to other municipalities seeking to house the targets of their parallel extortionate programs.  In jailing and holding the Plaintiffs, Defendant never offered to provide them with counsel who could advise them of their rights or otherwise protect them from this predatory scheme.[1]

4.     St. Ann's officials and employees—through their conduct, decisions, training, rules, policies, practices, and procedures—constructed and implemented this scheme and imposed these harsh conditions for the overriding purpose of raising municipal revenue (and not for any legitimate law enforcement purpose).

---

[1] The architecture of this illegal scheme has been in place for many years.  *See, e.g.*, T.E. Lauer, *Prolegomenon to Municipal Court Reform in Missouri*, 31 Mo. L. Rev. 69, 88 (1966) ("[I]t seems that many citizens of the state are being confined needlessly in our city jails . . . ."); *id.* at 85 ("[I]t is disgraceful that we do not appoint counsel in our municipal courts to represent indigent persons accused of ordinance violations."); *id.* at 90 ("It is clear that many municipalities have at times conceived of their municipal courts in terms of their revenue-raising ability. . . .").

5.      Defendant resurrected its modern analogue of debtors' prisons—an institution this country rejected as inhumane more than a century ago—to provide the coercive leverage to effectuate this scheme by.  That leverage has made the scheme increasingly profitable.  St. Ann's law enforcement and municipal court practices focus on maximizing revenue, rather than promoting public safety, administering justice, or providing the bare rudiments of due process. Defendant has victimized the most vulnerable, those living in or near poverty, who are least able to bear, or to avoid, the extortionate costs this system has imposed.

6.      Thousands of people in the Plaintiffs' position must divert funds from their disability checks, or sacrifice meager earnings their families desperately need for food, diapers, clothing, rent, and utilities, to pay spiraling court fines, fees, costs, and surcharges.  Whether or not valid, a citation for a minor offense—a broken tail light, a lane change without signaling— often generates crippling debts for people like Plaintiffs, resulting in jail time when they cannot afford to pay, deepening their already desperate poverty.

7.      The summary imprisonment imposed on people who have appeared in the municipal courts of St. Ann and its neighboring municipalities but who could not afford to pay the sums of money demanded has frightened many away from the courthouse, allowing Defendant to jack up the fines even further and issue arrest warrants—intended to coerce payment—for "Failure to Pay" and "Failure to Appear."  Month after month, year after year, the cycle has repeated itself, ensnaring Plaintiffs and those like them in a system from which it has been nearly impossible to extricate themselves.

8.      Defendant has abused the legal system to bestow a patina of legitimacy on what is, in reality, extortion.  If private parties had created and implemented this scheme, enforced it by threatening and imposing indefinite incarceration under inhumane conditions, and milked

poor families of millions of dollars, the law would punish them as extortionists and racketeers, and the community would take steps to prevent them from exploiting the most vulnerable of its members.  These predatory practices are no more legitimate—and indeed are more outrageous—when state and local government actors perpetrate them under color of law.

9.      The treatment of the named Plaintiffs reveals a coordinated, systemic effort to deprive some of the area's poorest residents of their rights under the United States Constitution. For years, Defendant has engaged in the same conduct, as a matter of policy and practice, against Plaintiffs and thousands of other impoverished citizens.   These citizens' fundamental constitutional right to liberty, however, does not depend on their income.  Defendant has created or revived a *de facto* debtors' prison so filthy as to be intolerable, using it as a tool to cow poor people into financing municipal government.   Such flagrant abuse is not consistent with the values this country holds dear, with the rule of law, or with the constitutional guarantee of due process.

10.      Importantly, to enable and perpetuate this unconstitutional scheme, the City of St. Ann acts as a veritable warehouse in which other neighboring municipalities can deposit excess arrestees.[2]   On their own, each of these other neighboring municipalities lacks the capacity to hold more than a few people at a given time, so they contract with St. Ann to arrest a significantly greater number of people for alleged municipal ordinance violations and ship them to St. Ann Jail, where arrestees languish until the municipalities can extract enough money from the individuals or their families to satisfy their demands.  Without the availability of St. Ann's

---

[2] Plaintiffs originally named twelve of these municipalities—Edmundson, Normandy, Cool Valley, Velda City, Beverly Hills, Pagedale, Calverton Park, St. John, Bel-Ridge, Wellston, Velda Village Hills, and Bellefontaine Neighbors—as defendants along with the City of St. Ann. Pursuant to this Court's April 24, 2017 Order, Plaintiffs are filing this Second Amended Complaint against the City of St. Ann only.

recently-expanded jail, which "sleeps 42, not including a pen for short-timers and a juvenile area,"[3] these other municipalities would not be able to incarcerate, or threaten to incarcerate, human beings too poor to pay their debts.

11.     In July 2017, Plaintiffs filed a second amended complaint asserting six causes of action for violations of Plaintiffs' constitutional rights.  *See* Second Amended Complaint, *Thomas v. City of St. Ann*, No. 4:16-cv-1302, (E.D. Mo. filed July 21, 2017), ECF No. 96.  The Court denied St. Ann's motion to dismiss the second amended complaint, but ordered that Plaintiffs' sixth cause of action concerning the deplorable jail conditions at St. Ann's jail be severed into this new action.  The Court further ordered Plaintiffs to file a second amended complaint in this new action asserting only their claims relevant to the jail-conditions claim.  Pursuant to the Court's order, the remainder of this second amended complaint focuses on the facts relevant to the jails-condition claim.

## JURISDICTION AND VENUE

12.     This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201, *et seq*., and the Eighth and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

13.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

14.     Plaintiff Quinton M. Thomas is a 29-year-old man.

15.     Plaintiff Roelif Earl Carter is a 64-year-old man.

16.     Plaintiff Bradley Jiles is a 25-year-old man.

---

[3] Bogan, Jesse, *A Sense of Change in St. Ann*, ST. LOUIS POST-DISPATCH (Aug. 5, 2012), http://www.stltoday.com/news/local/metro/a-sense-of-change-in-st-ann/article_c2dd4c0b-45fc-552f-8df9-8ec5db29d7cb.html.

17.      Plaintiff Angela Davis is a 45-year-old woman.

18.      Plaintiff Meredith Walker is a 48-year-old woman.

19.      Plaintiff Brittany Ellis is a 27-year-old woman.

20.      Plaintiff Donya Pierce is a 27-year-old woman.

21.      Plaintiff Mawoussime Adoboe is a 34-year-old woman.

22.      Plaintiff Veronica Murphy is a 33-year-old woman.

23.      Plaintiff Charles Riley is a 59-year-old-man.

24.      Defendant City of St. Ann is a municipal corporation, organized under the laws of the State of Missouri.  The City of St. Ann operates the St. Ann Jail, the St. Ann Police Department, and the St. Ann Municipal Court.

## FACTUAL ALLEGATIONS

25.      St. Louis County, Missouri is comprised of 90 municipalities and 81 separate municipal courts.  These municipalities range in population from under 100 people to over 10,000.  The population of the City of St. Ann is estimated to be 12,812.

26.      As a matter of policy and practice, St. Ann detains inmates jailed for non-payment of debts in overcrowded cells where St. Ann ignored basic principles of hygiene, sanitation, medical and mental health care, and inmate safety.

27.      As a matter of policy and practice, officers of the St. Ann Jail have routinely:

a.      Denied inmates toothbrushes, toothpaste, and soap;

b.      Detained inmates in dirty cells that reek of human waste and bodily odors and fluids;

c.      Forced inmates to wear the same clothes for days and weeks without access to laundry or clean undergarments;

d.     Forced inmates to endure days, or even weeks, without providing access to a shower;

e.     Detained inmates in cold temperatures, even where the inmates have been huddled together with a single thin blanket and have begged guards for warm blankets;

f.     Detained inmates in conditions that cause them to develop illnesses and infections in open wounds that spread to other inmates;

g.     Detained inmates in conditions in which they are required to sleep next to an open unclean toilet, atop which sits a water faucet from which they must use their unclean cupped hands as vessels to drink water in an unsanitary manner, leading inmates to suffer dehydration;

h.     Refused to provide women adequate hygiene products for menstruation;

i.     Forced inmates to sleep amidst refuse because of the lack of adequate trash removal;

j.     Denied inmates vital medical care and prescription medication, even when their families begged for permission to bring medications to the jail;

k.     Failed to provide inmates who have serious mental health issues with necessary mental health treatment or prescription medication;

l.     Provided inmates food so insufficient and uniform that they lose significant amounts of weight and lack essential nutrients;

m.     Deprived inmates of books, legal materials, exercise, television, internet, and natural light; and

n.     Sexually abused and physically beaten inmates, which results from a culture of unaccountability and abuse due to inadequate training and supervision.

28.     These abuses and deprivations are accompanied by other pervasive humiliations. Jail guards routinely taunt impoverished people who are unable to pay for their release, and humiliate the inmates with degrading epithets, many of which focus on how bad the inmates look and smell after languishing in the St. Ann Jail.

29.     The totality of these conditions described by the Plaintiffs and by numerous witnesses amounts to unlawful punishment.  St. Ann has designed and maintained a jail that is degrading and humiliating in order to punish debtors for not paying their debts and to discourage them from missing payments to Defendant and its neighboring municipalities.  The purpose and effect is to coerce debtors to borrow money or use money otherwise needed for the basic necessities of life in order to avoid incarceration in the St. Ann Jail.

30.     The jail conditions created and perpetuated by Defendant would be unconstitutional under the Eighth Amendment even for convicted prisoners.  Defendant forces these conditions on pretrial detainees and post-judgment debtors jailed solely because of their inability to make monetary payments and not pursuant to any criminal sentence.

31.     The use of the St. Ann Jail and its deplorable conditions for discrete and indefinite periods of confinement has the purpose and effect of punishing and coercing indigent people rather than achieving any lawful goal.

D.     **The Named Plaintiffs' Imprisonment**

       **i.     Quinton M. Thomas**

32.     Quinton Thomas is a 29-year-old man who resides in St. Louis, Missouri.  He is African-American.

33.     Mr. Thomas has been jailed in the St. Ann Jail at least three times on warrants issued by Normandy and Edmundson, among other municipalities.

34.     In 2013, Mr. Thomas was driving to work and was stopped by officers of the Edmundson Police Department for allegedly failing to make a complete stop at a stop sign. Mr. Thomas denies running the stop sign. The officers informed Mr. Thomas that he had outstanding warrants in Normandy, Pine Lawn and St. John, among others. The Edmundson police officers took Mr. Thomas to the St. Ann Jail.

35.     The conditions in the St. Ann Jail were terrible. The jail cells were packed four people to a cell. The cells were so filthy that Mr. Thomas did not want to make contact with the walls or even the mattresses, which appeared not to have been cleaned in years. Jail officers provided Mr. Thomas (and other inmates) with a used blanket, but nothing else to separate himself from the disgusting and unsanitary mattress.

36.     The food in the St. Ann Jail was unhealthy and nearly inedible. Every meal consisted of a bologna sandwich (with greenish meat and hard bread), applesauce, and black coffee.

37.     After three days, the St. Ann Jail "released" Mr. Thomas, and officers from the City of St. John transported Mr. Thomas to the St. John Police Department.

38.     In January 2015, officers of the Dellwood Police Department responded to complaints of a domestic disturbance at Mr. Thomas' home stemming from a verbal argument between Mr. Thomas and his girlfriend. The officers ran Mr. Thomas' and his girlfriend's names and discovered that both had outstanding warrants for unpaid traffic tickets.

39.     The officers arrested Mr. Thomas and took him to the St. Louis County Justice Center in Clayton on outstanding warrants for unpaid traffic tickets.

40.    After approximately three days, officers at the Justice Center transferred Mr. Thomas to the St. Ann Jail, which held him on behalf of Normandy and Edmundson, among other municipalities, for the outstanding warrants described above.

41.    As on previous occasions, the St. Ann Jail incarcerated Mr. Thomas in overcrowded and filthy cells, and provided disgusting and unhealthy food.

42.    After at least one day in the St. Ann Jail, officers at the St. Ann Jail transferred Mr. Thomas to the O'Fallon Jail.

43.    In May 2016, officers of the Beverly Hills Police Department stopped Mr. Thomas for a broken bumper. The officers informed Mr. Thomas that he had outstanding warrants in Normandy and Edmundson, among others, and took Mr. Thomas to the Beverly Hills Police Department.  The officers detained Mr. Thomas at the Beverly Hills Police Department for approximately one hour.

44.    Officers from the St. Ann Police Department picked Mr. Thomas up from the Beverly Hills Police Department and took him to the St. Ann Jail on behalf of Normandy and Edmundson (in connection with warrants for unpaid traffic tickets and "Failure to Pay" and/or "Failure to Appear" charges, as described above).

45.    As on previous occasions, the St. Ann Jail incarcerated Mr. Thomas in overcrowded and filthy cells, and provided disgusting and unhealthy food.  Also as on previous occasions, officers at the St. Ann Jail were aware, or should have been aware, that the basis for Mr. Thomas' incarceration was his inability to pay fines from minor, traffic-related offenses.

46.    Mr. Thomas was held in the St. Ann Jail for a day and a half.  Mr. Thomas missed a day of work at his construction job because he was incarcerated.  As a result of missing work

due to his incarceration for failure to pay fines and costs from minor, traffic-related offenses, Mr. Thomas was fired from his construction job.

### ii.    Roelif Earl Carter

47.    Roelif Earl Carter is a 64-year-old husband and the sole provider for his wife and daughter.  He is African-American.

48.    Mr. Carter is a Veteran of the United States Air Force and was honorably discharged from service in 1976.

49.    After his service in the Air Force, Mr. Carter worked for the Ford Motor Company for thirteen years until he suffered a brain aneurysm that left him unable to work.  He currently receives Supplemental Security Income due to his disability.

50.    Mr. Carter has been jailed in the St. Ann Jail on at least four occasions in connection with warrants issued by Normandy and Cool Valley.  The warrants issued by Normandy and Cool Valley initially stemmed from minor traffic infractions, including driving with a suspended license and failure to provide proof of insurance, from the early 2000s.

51.    In December 2012, Mr. Carter was pulled over in Ferguson by officers of the Ferguson Police Department.  The officers informed Mr. Carter that he had outstanding warrants in Cool Valley and Normandy (as described above) and took Mr. Carter to the St. Ann Jail.

52.    The St. Ann Jail held Mr. Carter for three days on behalf of Cool Valley.  After three days, Cool Valley "released" Mr. Carter.  However, he remained in the St. Ann Jail, which now held him on behalf of Normandy (based on the outstanding warrants, as described above). The St. Ann Jail officers again informed Mr. Carter that he could be released if he paid a $500 bond.  Again, there was no bail hearing.  And again, Mr. Carter was unable to make this payment to secure his release.

53.     Mr. Carter spent three days in the St. Ann Jail on behalf of Normandy and then—after a total of six days—the St. Ann Jail finally released him.

54.     In or around December 2013, officers of the Ferguson Police Department stopped Mr. Carter and again incarcerated him in the St. Ann Jail on behalf of Cool Valley and Normandy for the same "Failure to Pay" and/or "Failure to Appear" warrants discussed above. Again, officers at the St. Ann Jail were aware, or should have been aware, that the basis for Mr. Carter's incarceration was his inability to pay fines from minor, traffic-related offenses.

55.     The St. Ann Jail again held Mr. Carter for three days on behalf of Cool Valley and three days on behalf of Normandy (for a total of six days).

56.     After six days, the St. Ann Jail "released" Mr. Carter on behalf of Normandy. However, officers of the St. Ann Jail informed Mr. Carter that they were continuing to hold him on behalf of St. Louis City.  Mr. Carter told the jail officers that he did not have any outstanding warrants in St. Louis City.  The officers, presumably after confirming that Mr. Carter did not have any outstanding warrants in St. Louis City, finally released him at 2:00 a.m.  The officers never allowed Mr. Carter to make a free phone call, nor did they provide him any means of transportation from the Jail.  As a result, Mr. Carter had to walk 15 miles to his home on a cold night, finally reaching his home the next morning.

57.     St. Ann subjected Mr. Carter to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.  The conditions in the St. Ann Jail were filthy.  Mr. Carter was given an orange jumpsuit to wear.  The food provided to Mr. Carter was inadequate, sometimes only a honey bun and a packaged pot pie for the whole day.

**iii.    Bradley Jiles**

58.     Bradley Jiles is a 25-year-old African American man.

59.     Mr. Jiles has been jailed more than ten times in the last five years in connection with alleged municipal ordinance violations.  Over the span of approximately one year — from the summer of 2014 to the spring of 2015 — Mr. Jiles was jailed on four separate occasions in connection with unpaid fines for traffic and other minor violations.

60.     Particularly, in June 2015, Mr. Jiles was driving to court after work to obtain a replacement title for his car after the original title had been damaged in the rain.  He was driving within the speed limit and was pulled over.  When Mr. Jiles inquired as to why, the officer told him that he was unregistered, had been speeding, and looked suspicious.  The officer said to Mr. Jiles, "I could be an asshole and give you all these tickets because of your attitude."  The officer cited Mr. Jiles for failure to register, improper vehicle registration, and expired license.

61.     Mr. Jiles was arrested and spent two days in St. Louis County Justice Center.  The holding cell was covered with old gum and graffiti.  Mr. Jiles pled guilty and was sentenced to two days of time served.

62.     Officers at the Justice Center then transported Mr. Jiles to the Hazelwood Jail on a warrant for "Failure to Pay" and/or "Failure to Appear" in connection with an unpaid traffic ticket for driving with an expired license.

63.     After 24 to 48 hours, the Hazelwood Jail "released" Mr. Jiles and transported him to the St. Ann Jail on a warrant for "Failure to Pay" and/or "Failure to Appear" in connection with an unpaid traffic ticket in Edmundson for driving with invalid license plates.

64.     Mr. Jiles could not afford to pay the bond to secure his release.  As a result, the St. Ann Jail held Mr. Jiles for at least three days.  While he was in the St. Ann Jail, Mr. Jiles repeatedly asked how long he would be held, but was told nothing.

65.     Finally, one of the St. Ann Jail officers noticed in Mr. Jiles's file that Mr. Jiles should have been released.  The St. Ann Jail released Mr. Jiles later that day.

66.     St. Ann subjected Mr. Jiles to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.

**iv.     Angela Davis**

67.     Angela Davis is a 45-year-old African-American mother of four.  She resides in St. Louis, Missouri and has worked for Wells Fargo Advisors in Frontenac for the last eight years.

68.     In September 2013, Ms. Davis was waiting to make a left turn at a Florissant intersection.  While she waited, a police car turned around and pulled up next to her.  After the light turned green, Ms. Davis made a left turn.  The police car flashed its lights and pulled her over.  The officer said he pulled Ms. Davis over because her tags were expired.

69.     The officer ran the names of Ms. Davis and her two passengers.  The search returned multiple warrants for Ms. Davis in Normandy from 2013 (no proof of insurance, failure to register her vehicle, and corresponding violations of "Failure to Pay" and/or "Failure to Appear"), University City from 2012 (failure to register her vehicle and speeding), and Florissant (failure to register her vehicle).

70.     After the police completed their search for outstanding warrants, they arrested Ms. Davis.

71.     Over the next 22 hours, Ms. Davis was dragged to four separate jails.  Her first stop was Florissant Jail.  She arrived there around 10:00 or 11:00 p.m. that Sunday night, leaving around 1:00 a.m. on Monday morning.

72.     When she arrived at the Florissant Jail, officers informed her that she could secure her release if she paid a bond of $800.

73.     Florissant failed to provide Ms. Davis a court date or any notice of next steps following her imprisonment.  Instead, they handed her off to University City.

74.     Upon arriving at University City, Ms. Davis learned that her sister had paid the $150 bond amount owed University City while Ms. Davis was imprisoned in Florissant.

75.     University City held Ms. Davis in jail for approximately one hour.

76.     University City next transported Ms. Davis to Frontenac.  The Frontenac Jail held Ms. Davis for two hours.

77.     After two hours, the Frontenac Jail "released" Ms. Davis and gave her a court date.

78.     After her "release" from Frontenac, Ms. Davis was next transported to the St. Ann Jail.

79.     St. Ann subjected Ms. Davis to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.  Ms. Davis spent around six hours locked in the St. Ann Jail, growing increasingly unnerved by sharing a cramped, noisy cell with a schizophrenic inmate who was announcing her intent to kill someone.  The guards made no effort to separate this inmate from others or otherwise to assure the safety of Ms. Davis and the other inmates.

80.     Officers at the St. Ann Jail did not tell Ms. Davis why she was in jail and refused to discuss a bond.  The officers told Ms. Davis that she would have to call the Normandy Municipal Court to find out how much money she owed.

81.    The officers, however, did not allow Ms. Davis to make any calls, thereby preventing her from calling the court to determine how much money she owed, from attempting to obtain money from family or friends to secure her release, and from exercising her right to seek legal counsel.

82.    After being detained for around two hours, Ms. Davis' sister paid Ms. Davis' bond for her Normandy warrant.  Officers at the St. Ann Jail refused to release Ms. Davis, however, claiming she had a pending warrant in Berkeley.

83.    Ms. Davis' sister drove to Berkeley twice to pay her sister's bond.  On both occasions, Berkeley officials said that they had notified St. Ann that they did not want to detain Ms. Davis.  Notwithstanding this communication from Berkeley, the St. Ann Jail arbitrarily and petulantly continued to hold Ms. Davis for several more hours.

84.    Finally, the St. Ann Jail released Ms. Davis.  Officers at the St. Ann Jail did not tell Ms. Davis why she had been released; they merely gave Ms. Davis a sheet of paper with a court date, which they had stapled to her belongings.

**v.    Donya Pierce**

85.    Plaintiff Donya Pierce is a 27-year-old African-American mother of two children.

86.    Ms. Pierce is currently employed at Mount Carmel Rehabilitation Center.

87.    In March 2014, officers of the St. Ann Police Department pulled Ms. Pierce over for a routine traffic stop.  Ms. Pierce was driving a male passenger at the time.

88.    The officers searched the vehicle without Ms. Pierce's consent and found that the male passenger was in possession of marijuana.

89.     Although the officers did not find any marijuana in Ms. Pierce's possession, they arrested her for marijuana possession and took her to the St. Ann Jail.  Officers at the St. Ann Jail informed Ms. Pierce that she owed a cash bond of more than $1,000.

90.     The officers also informed Ms. Pierce that she had warrants for traffic-related offenses in St. Ann, Jennings, Hazelwood, University City, Pagedale, and Breckenridge Hills.

91.     The St. Ann Jail held Ms. Pierce for three weeks.  Each week, officers of the St. Ann Jail took Ms. Pierce to appear before a St. Ann Municipal Court judge.  Each time, Ms. Pierce explained that she was innocent of the marijuana charge and pleaded for her release.  Each time, the municipal court judge denied these pleas and sent her back to the St. Ann Jail.

92.     St. Ann subjected Ms. Pierce to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.  The conditions were overcrowded and unsanitary.  Although there were only eight beds per cell, roughly 20 women were assigned to each cell.  Women who were ill and experiencing drug withdrawals—the symptoms of which included vomiting, flatulence, nausea, and disorientation, among many other things—were placed in the same cells, which exacerbated the unsanitary conditions.

93.     Inmates at the St. Ann Jail were not allowed to shower until they had been at the jail for a week.  Further, there were no trashcans in the cells, so inmates regularly piled their trash in the corner.  In addition to being unsanitary, these conditions created a pungent, unpleasant odor in the jail.

94.     The officers at the St. Ann Jail refused to allow Ms. Pierce to use the phone.  As a result, she lost her job and her house.  In addition, Ms. Pierce's son missed approximately four weeks of school and was held back a grade because no one was able to take him to school besides his mother.  Further, Ms. Pierce almost lost custody of her son when one of his teachers

called the Child & Family Services Agency when he abruptly stopped coming to school. Because Ms. Pierce could not use the phone, she was unable to call the school to explain to them what was happening.

95.     After three weeks, the St. Ann Jail finally released Ms. Pierce.   St. Ann subsequently dropped the charges against Ms. Pierce for possession of marijuana.

### vi.     Brittany Ellis

96.     Brittany Ellis is a 27-year-old African-American woman.

97.     Ms. Ellis is currently employed as a cook in the Lake St. Charles Retirement Home.

98.     In July 2015, at approximately 9:30 p.m., Ms. Ellis was driving home from her job at the Family Dollar in her mother's truck.

99.     Officers of the St. Ann Police Department stopped Ms. Ellis.   The officers informed Ms. Ellis that they were pulling her over because her license plate information did not match the truck she was driving.  She tried to explain that she was driving her mother's truck, but to no avail.

100.    The officers arrested Ms. Ellis and had the truck she was driving towed.  Ms. Ellis and her mother did not have the $500 required to release the truck from the towing company.  As a result, Ms. Ellis' mother lost the truck permanently.

101.    The officers took Ms. Ellis to the St. Ann Jail.  The St. Ann Jail held Ms. Ellis for approximately eight days.  During that time, no St. Ann official informed Ms. Ellis of her bond amount (if any), the reason for her detention, or for how long she would be held.

102.    St. Ann subjected Ms. Ellis to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.  Officers at the St. Ann Jail

mistreated Ms. Ellis.  Officers took Ms. Ellis' glasses and refused to return them to her, even though she explained that she is legally blind.

103.     Ms. Ellis was menstruating during the course of her incarceration at St. Ann. When she asked for sanitary napkins and/or tampons, a St. Ann correctional officer threw a sanitary napkin and tampons at her.  Further, officers did not give her the privacy to go to the bathroom to handle her menstruation.  As a result, Ms. Ellis was forced to change her pads in her cell in front of other inmates and correctional officers.

104.     After eight days, the St. Ann Jail finally "released" Ms. Ellis and immediately transferred her to the St. Louis County Justice Center on a Hazelwood warrant for traffic-related offenses.

105.     The St. Louis County Justice Center held Ms. Ellis for 12 days.  During that time, officers at the Justice Center subjected Ms. Ellis to an extremely invasive search, forcing her to undress in front of a police officer who told her that she had "big breasts."  The officers also forced Ms. Ellis to spread her buttocks for the search, even though Ms. Ellis was in jail for a nonviolent, traffic-related offense.

106.     After 12 days, the St. Louis County Justice Center "release" Ms. Ellis and immediately transferred her to the Ferguson Jail.  The Ferguson Jail held Ms. Ellis for two days. During this time, officers at the Ferguson Jail did not inform her of the bond amount, ultimately releasing her and giving her a court date to appear in Ferguson Municipal Court.

107.     In total, Ms. Ellis was incarcerated for 22 straight days for her inability to pay fines for traffic-related offenses.  Because she was detained for so long, Ms. Ellis was terminated from her job at the Family Dollar (the store informed her that they were unable to hold her position for longer than a week).

### vii.    Meredith Walker

108.    Meredith Walker is a 48-year-old African-American mother of two living in Florissant, Missouri.

109.    In the last five years, Ms. Walker has been jailed on at least ten occasions by St. Louis municipalities for unpaid fines from traffic tickets and other minor municipal violations.

110.    In the last five years, Ms. Walker has been jailed in St. Ann on behalf of Normandy, Velda Village Hills, Calverton Park and Velda City.

111.    On almost all of these occasions, Ms. Walker experienced the so-called "muni-shuffle": she was transferred from one municipal jail to another, paying bonds at each to secure her "release" to the next. A $500 bond was posted to secure Ms. Walker's release from Normandy on February 7, 2012; a $500 bond was posted to secure Ms. Walker's release from Calverton Park on November 1, 2012; a $100 bond was posted to secure Ms. Walker's release from Velda Village Hills; a $500 bond was posted to secure Ms. Walker's release from Normandy on February 4, 2014. Ms. Walker's mother or stepfather paid the bonds when they were able.  If neither Ms. Walker or a relative could afford to pay bond, Ms. Walker remained in jail until jail officials (or the municipality on whose behalf she was held) decided to release her.

112.    Ms. Walker has tried to pay off her debts to the municipalities, but simply cannot afford to do so.  It is well known in the community that showing up at court without full payment will lead to incarceration.  As a result, Ms. Walker feared that if she went to court without the money to pay her fine, she would immediately be placed in jail.

113.    Ms. Walker has been unsuccessfully trying to pay off approximately $3,000 of fines over the last four years.  On multiple occasions, court clerks have told Ms. Walker that she

resolved all her charges, only to discover more charges later.  On other occasions, court clerks have failed to properly record payments made by Ms. Walker.

114.    Ms. Walker's inability to extricate herself from this cycle of debt and jailing has virtually destroyed Ms. Walker's life.

115.    Ms. Walker is unemployed and has been unable to find a new job because of her traffic record and because she does not have a valid license.  Many of the positions for which she is otherwise qualified require a valid driver's license to transport clients.

116.    Ms. Walker has been forced to change her appearance, because she discovered that she was stopped by police officers more often when she had dreadlocks in her hair.

117.    Ms. Walker does not have a valid driver's license because she cannot afford to pay off all of her fines, costs, surcharges, and interest.  As a result, Ms. Walker is forced to rely on family and friends to drive her to the store or to her son's basketball games, placing strain on cherished relationships.

118.    Ms. Walker has spent many holidays in jail for unpaid traffic tickets, missing time with family and friends.

119.    Ms. Walker is unable to travel around the St. Louis area, in part because bus service in North County (where she lives) is unreliable, and in part because she is now terrified of the police.

**viii.    Mawoussime Adoboe**

120.    Mawoussime Adoboe is a 34-year-old mother of two children.  Ms. Adoboe has been unemployed since 2012 and relies on welfare and social security to support herself.

121.    On April 15, 2015, Ms. Adoboe was involved in a car accident.  The police arrived at the scene of the car accident and conducted a field sobriety test, which police claimed

Ms. Adoboe failed.  The police officer cursed at her, called her a "bitch," and said, "You know I don't like you."  The St. John police arrested Ms. Adoboe for driving while intoxicated and took her to the St. John police station.  The arresting police officer told other officers at the jail "not to give her a chance."

122.    The arresting police officer then took Ms. Adoboe to SSM Health DePaul Hospital - St. Louis, where she was administered a shot, although she did not know what it was for.  She was also given a prescription for antibiotics, which the police officer filled before taking Ms. Adoboe to the St. Ann Jail on behalf of St. John.

123.    Ms. Adoboe was held at the St. Ann Jail for eight days on $1,500 bond.  Ms. Adoboe could not afford to pay the $1,500 bond amount, and therefore was not able to secure her release.

124.    After several days, Ms. Adoboe's family and friends were able to pool their financial resources to come up with the $1,500 for bond.  However, when the father of Ms. Adoboe's daughter attempted to post bond, St. Ann refused the payment without providing a reason.

125.    Ms. Adoboe was never brought before a judge during her eight-day detention at the St. Ann jail, nor was she informed of her right to, or offered, a lawyer.

126.    St. Ann's jail refused to give Ms. Adoboe her medication for her serious chronic medical conditions.

127.    St. Ann subjected Ms. Adoboe to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.  The conditions in St. Ann Jail were filthy.  Ms. Adoboe and other inmates requested supplies to clean their living space, but the guards refused.  The cell in which Ms. Adoboe lived was designed to accommodate six people,

but at times up to fifteen people were living in the cell.  When there were more people than beds, inmates were forced to sleep on the floor.

128.    Ms. Adoboe was allowed to shower only once every three days in a bathroom in filthy conditions.

129.    St. Ann Jail Guards tossed cold food and inedible food onto the floor for the inmates to eat.

130.    St. Ann Jail Guards were rude to inmates and indifferent to their needs, and called Ms. Adoboe "crazy" and an "African child" on multiple occasions.

131.    One of Ms. Adoboe's relatives attempted to come to the St. Ann Jail to visit her, but the guards never informed her and she was not allowed to meet with her relative.

132.    Guards at the St. Ann Jail limited inmates' use of phones.  For example, if Ms. Adoboe placed a call and the person did not answer the first time, she was not allowed to call them back.  The guards also limited the content of inmates' phone calls, not allowing Ms. Adoboe to give any in-depth explanations to people on the phone.

133.    After her "release" from the St. Ann Jail, Ms. Adoboe was transferred to the St. Charles Jail in connection with unpaid traffic tickets and "Failure to Pay" or "Failure to Appear" charges in St. Charles.  Ms. Adoboe was detained in the St. Charles Jail for six days, at which point she was able to post $250 bond to secure her release.

134.    Ms. Adoboe's detention had significant collateral consequences in addition to the suffering Ms. Adoboe endured in St. Ann Jail.  For example, while she was incarcerated, Ms. Adoboe's children were shifted from one person's care to another on three different occasions.

135.    On at least one other occasion, Ms. Adoboe was detained in the St. Ann Jail for a speeding ticket in St. Ann.  Ms. Adoboe was unable to afford the $500 bond and therefore was forced to spend a night in the St. Ann Jail.

### ix.    Veronica Murphy

136.    Veronica Murphy is a 32-year-old single African-American mother of two young children living in St. Louis, Missouri.

137.    Ms. Murphy single-handedly supports her two minor children on a very limited income.

138.    Ms. Murphy has been jailed in the St. Ann Jail "so many times [she] can't remember" in connection with warrants issued by Bel-Ridge, Normandy, and St. Ann, among others.  The warrants issued by Bel-Ridge initially stemmed from minor traffic infractions issued prior to 2009.

139.    In April 2009, Ms. Murphy departed the University of Missouri-St. Louis campus after a college class to pick up her son—who was five years old at the time—at his school in Normandy, Missouri.  She never arrived at the school because officers of the Normandy Police Department stopped Ms. Murphy just one block away.

140.    The Normandy Police informed Ms. Murphy that they stopped her pursuant to an alleged warrant from the State of Texas.  The Normandy Police arrested Ms. Murphy and towed her vehicle to an impound lot.

141.    The two young Murphy children—ages three and five at the time—sat at their schools awaiting their mother until the schools were able to contact members of Ms. Murphy's family to care for them.

142.    The Normandy Police took Ms. Murphy to their precinct, fingerprinted and booked her, and notified Texas of her arrest. The State of Texas informed the Normandy Police that Ms. Murphy was not wanted for extradition.

143.    Instead of releasing Ms. Murphy, Normandy Police checked their computer system and determined Ms. Murphy had an outstanding warrant from Bel-Ridge. The Normandy Police then transported Ms. Murphy to the St. Ann Jail.

144.    St. Ann subjected Ms. Murphy to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail. At the St. Ann Jail, Ms. Murphy endured what she now describes as "the worst memories of [her] life" in conditions most inhumane: St. Ann officials (1) forced Ms. Murphy to wear an orange jumpsuit "like [she] was in prison"; and (2) provided inadequate food sometimes consisting of only a honey bun and a packaged pot pie for an entire day—"all because [she is] a single mom who can't pay a traffic ticket," as Ms. Murphy attests.

145.    Ms. Murphy was held in St. Ann Jail for two weeks.

146.    During this time period (which included her birthday), the Murphy children were left motherless while Defendant St. Ann jailed Ms. Murphy on behalf of Bel-Ridge simply because she could not afford to pay the bond amount set by Bel-Ridge, which, on information and belief, exceeded $500.

147.    Once released from St. Ann Jail, Ms. Murphy could not afford to pay to retrieve her vehicle from impound; in fact, Ms. Murphy was never able to afford the impound fees to retrieve her car, and she ultimately lost the 1999 Chevy Cavalier which she once owned outright.

148.     Since her initial two-week incarceration in 2009, Ms. Murphy has repeatedly been arrested based on her inability to pay fines and alleged "Failure to Appear" charges, including a most recent incarceration on Bel-Ridge's warrant in May 2014.

**x.     Charles Riley**

149.     Charles Riley is a 59-year-old man who resides in St. Louis, Missouri.  He is African-American.

150.     At all relevant times herein, Mr. Riley has had a disability related to back problems and back pain, and thus receives only $1,100 of monthly income in the form of Social Security disability payments.

151.     Mr. Riley has been jailed by St. Ann twice in his lifetime for alleged minor municipal ordinance infractions.

152.     On one Friday evening, October 25, 2013, Mr. Riley was driving his own vehicle when a St. Ann police officer pulled him over, allegedly for rolling through a stop sign.

153.     The St. Ann officer informed Mr. Riley that he had an active failure to appear warrant in the municipality of Florissant, Missouri.

154.     The St. Ann officer instructed Mr. Riley to step out of the vehicle. Mr. Riley complied, and the St. Ann officer placed Mr. Riley under arrest.

155.     Mr. Riley then asked the St. Ann officer to allow Mr. Riley to turn off his vehicle to get his keys and his cell phone.  The St. Ann officer denied Mr. Riley's request, left the car running, and told Mr. Riley "We're going to tow it anyway."

156.     The St. Ann officer placed Mr. Riley into the St. Ann police car and drove Mr. Riley to the St. Ann police station, where the officer asked Mr. Riley, "Do you have $350 to post bond?"

157.     Mr. Riley informed the St. Ann police officer that he could not afford to pay the $350 bond, and asked the officer what the bond was for.  The St. Ann officer replied, "Why should we believe you are going to come to court for us when you didn't go to court for them [Florissant]?"  There was no bail hearing.

158.     St. Ann then locked Mr. Riley in a small jail cell with two (and at one point, three) other adult men, claiming that Mr. Riley should just wait because "Florissant is on their way."

159.     St. Ann subjected Mr. Riley to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.  The jail cells were packed full of people.  The cells were so filthy that Mr. Riley did not want to make contact with the walls or even the sleeping pads, which were dirty and appeared uncleaned.

160.     The St. Ann Jail provided Mr. Riley with no hygiene or personal care items: no soap, no washrags, no toothbrushes, no toothpaste, and no deodorant.  The cell contained a toilet fixture with a water faucet on its top, from which Mr. Riley and the other cellmates had to use their own cupped, dirty hands to capture drinking water.

161.     Mr. Riley and the other inmates were served food by St. Ann that was unhealthy and nearly inedible.  Every meal consisted of a bologna sandwich or canned spaghetti.  Some breakfasts included a pre-packaged cinnamon roll and old milk.

162.     Officers at the St. Ann Jail did not allow Mr. Riley or his cellmates to take a shower for several days.  In fact, the only time the St. Ann Jail allowed Mr. Riley to take a shower was after two days, when one St. Ann jail officer—a cousin of a friend of Mr. Riley's then-girlfriend—specifically allowed Mr. Riley to take a shower after being contacted by the officer's cousin.  When the officer called to Mr. Riley to allow him to shower, one of Mr. Riley's

cellmates begged for one, too, and the officer permitted only Mr. Riley and that cellmate to shower.

163.    Mr. Riley had difficulty sleeping during his five days in the St. Ann Jail.  St. Ann's jail officers provided Mr. Riley (and the other inmates) a thin sheet and pillow as bedding to use on the thin, dirty sleeping pads, which provided little warmth and no support.  Mr. Riley had informed the St. Ann jail officers about his disability, his back injury, and his resulting chronic back pain, but the St. Ann jailers told Mr. Riley he could not receive any special accommodation or medicine because "Florissant is coming to get you soon."  Additionally, there were no windows in the St. Ann Jail cell, nor any clocks to tell whether it was morning or night, and the jail lights were always turned on.

164.    Sometime during Mr. Riley's incarceration at the St. Ann Jail, Mr. Riley's girlfriend (now his wife) called Florissant police, who informed her at that time that they did not have any record of Mr. Riley being in custody in St. Ann, and that he was not on their list to be picked up.

165.    Mr. Riley's then-girlfriend also contacted a private attorney—who Mr. Riley later learned was and is a prosecutor and city counselor in several other municipalities—for assistance in securing Mr. Riley's release.  On information and belief, sometime on that Sunday (October 27, 2013), the attorney contacted someone at St. Ann's government or jail to request Mr. Riley's release.

166.    Then, on Monday morning, the St. Ann jailers called out Mr. Riley's name and instructed him to stand near an intercom in the Jail.  The voice of a person Mr. Riley believed to be a judge's clerk or prosecutor's assistant—not a judge—spoke through the intercom and stated "You've been charged with running a stop sign. How do you want to plea?"

167.    Mr. Riley asked the voice on the intercom why he had to enter a plea at that time, and why he could not simply be given a summons and court date.  The voice on the intercom replied: "We're trying to make it so you can go home and you don't have to come back.  If you plea guilty to the charges, we can let you go.  We'll send some paperwork down to you."  The voice on the intercom did not provide Mr. Riley any notice of his right to counsel, nor did the voice seek to determine Mr. Riley's ability to pay any fines or fees associated with the proposed guilty plea.

168.    Mr. Riley felt he had to go along with St. Ann's plan in order to be released expediently, as it was the only option presented to him.

169.    Then, Mr. Riley was placed back in his cell to wait until that Monday evening, when the plea paperwork finally arrived.  Mr. Riley signed it, at which time the St. Ann jailers reassured Mr. Riley that Florissant was going to come get him.

170.    The rest of Monday night passed, along with all day Tuesday, while Mr. Riley continued to languish in the St. Ann Jail, waiting on Florissant.

171.    Finally, after five days in the St. Ann Jail, on the afternoon of Wednesday, October 30, 2013, the Florissant police arrived at the St. Ann Jail to pick up Mr. Riley.  Mr. Riley then spent several hours in a Florissant police van, picking up and dropping off other jailed individuals from other municipalities, before arriving at the Florissant police station early Wednesday evening.  His then-girlfriend posted a $300 bond to free Mr. Riley from Florissant's jail.

172.    The next day, Mr. Riley returned to St. Ann to free his vehicle from impound.  St. Ann said it was going to cost $400-500 to get the vehicle released.  Mr. Riley told St. Ann he did

not have the money, so he asked if he could go to the tow yard and collect his personal belongings from the vehicle.

173.    St. Ann officials told Mr. Riley he had to pay them $100 for the right to access the vehicle for the limited purpose of collecting his personal belongings.  Mr. Riley paid St. Ann's $100 demand.

174.    When Mr. Riley arrived at the tow yard with which St. Ann contracted to store inmates' vehicles, an employee at the tow yard would not permit Mr. Riley to collect his items, stating that he was "not supposed to do that," but took another $20 from Mr. Riley and went to the vehicle himself, bringing back Mr. Riley's cell phone, keys, wallet, and garage door opener.

175.    The tow yard employee informed Mr. Riley he had 30 days to pay to get his vehicle out of impound (at a daily fee of approximately $100) or the vehicle would be sold.

176.    Mr. Riley could not afford this amount of money, and lost his vehicle—a convertible Ford Mustang—along with approximately $300 worth of personal tools in the trunk of the vehicle.

177.    In addition to the loss of his personal vehicle and tools, Mr. Riley endured physical pain and mental anguish during the five days he spent caged in St. Ann's Jail, and also suffered embarrassment in front of friends and family, as his incarceration prevented Mr. Riley from participating in a dear friend's wedding as a groomsman on October 26, 2013.

E.    **Class Allegations**

178.    The Plaintiffs bring this action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

179.    A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the Defendant's unlawful jail conditions.

180.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

181.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

182.    Plaintiffs propose two Classes: a Declaratory and Injunctive Class and a Damages Class.

183.    The Declaratory and Injunctive Class is defined as:  All persons who are currently detained or who will be detained in the St. Ann jail.

184.    The Damages Class is defined as: All persons who, from August 9, 2011, until the present, were held in the St. Ann jail.

**1.    Numerosity.  Fed. R. Civ. P. 23(a)(1)**

185.    Over the past seven years, thousands of people have been detained in the St. Ann jail in deplorable and unconstitutional jail conditions.  Those who have been detained likely will be subjected to the same conditions absent the relief sought in this Complaint.

**2.    Commonality.  Fed. R. Civ. P. 23(a)(2).**

186.    The relief sought is common to all members of the Injunctive and Damages Classes, and common questions of law and fact exist as to all members of the Classes.  The Plaintiffs seek relief concerning whether Defendant violated their rights and relief mandating Defendant to change the St. Ann jail so that the Plaintiffs' rights will be protected in the future.

187.    An important common question of fact is whether the St. Ann Jail conditions are and have been unsanitary, unsafe, and inhumane in the ways described in this Second Amended Complaint.

188.    An important common question of law is whether the jail conditions described in

the Second Amended Complaint violate federal law.

**3.      Typicality.  Fed. R. Civ. P. 23(a)(3).**

189.    The named Plaintiffs' claims are typical of the claims of the members of the Classes, and they have the same interests in this case as all other members of the Classes that they represent.  Each of them suffered injuries from the failure of Defendant to comply with the basic constitutional provisions detailed below.  The answer to whether Defendant's policies and practices ae unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

190.    If the named Plaintiffs succeed in their claims, then that ruling will likewise benefit every other member of the Injunctive and Damages Classes.

**4.      Adequacy.  Fed. R. Civ. P. 23(a)(4).**

191.    The named Plaintiffs are adequate representatives of the Classes because they are members of the Classes and because their interests coincide with, and are not antagonistic to, those of the Classes.  There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

192.    Plaintiffs are represented by attorneys from Arnold & Porter Kaye Scholer LLP, a firm with experience litigating complex civil rights matters in federal court and extensive knowledge of both the details of the Defendant's jail's conditions and the relevant constitutional and statutory law.  Plaintiffs are also represented by attorneys from ArchCity Defenders, who have extensive experience with the functioning of the entire municipal court system through their representation of numerous impoverished people in the St. Louis area.[4]

---

[4] ArchCity Defenders is a non-profit public interest law firm based in Saint Louis.  It has represented the poor and homeless in cases involving municipalities in the St. Louis region for the past five years and is an expert on the ways in which Defendant's illegal practices and

193.    The efforts of Plaintiffs' counsel have so far included extensive investigation over a period of months, including numerous interviews with witnesses, Defendant's employees, Defendant's jail inmates, families, attorneys practicing in the Defendant's Municipal Courts, community members, statewide experts in the functioning of Missouri municipal courts, and national experts in constitutional law, debt collection, bankruptcy law, criminal law, and forced labor.

194.    Counsel have also observed numerous courtroom hearings in St. Ann and other municipalities across the region in order to compile a detailed understanding of state law and practices as they relate to federal constitutional requirements.  Counsel have studied the way that these systems function in other cities in order to investigate the wide array of options in practice for municipalities.

195.    As a result, counsel have devoted enormous time and resources to becoming intimately familiar with the Defendant's scheme and with all of the relevant state and federal laws and procedures that can and should govern it.  Counsel also have developed relationships

---

policies make and keep people poor.  ArchCity Defenders has recently brought class actions in the Eastern District of Missouri restricting the use of chemical munitions on peaceful protesters, is co-counsel on two federal class actions alleging the operation of debtors' prisons in Ferguson and Jennings, Missouri, two additional class actions ending cash bail, and an additional series of state class action suits alleging the imposition of illegal fees and fines in various municipal courts in the St. Louis County region. *See Templeton v. Dotson,* 4:14-cv-01019; *Jenkins et al. v. City of Jennings*, 15-cv-252-CEJ (E.D. Mo. 2015); *Fant et al. v. City of Ferguson*, 15-cv-253-AGF (E.D. Mo. 2015); *Powell v. City of St. Ann* 4:15-cv-840 (E.D. Mo. 2015); *Pierce v. City of Velda City*, 4:15-CV-570 (E.D. Mo. 2015); *White* v. *City of Pine Lawn*, 14SL-CC04194 (St. Louis Co. Cir. Ct., Dec. 2014); *Pruitt v. City of Wellston*, 14SL-CC04192 (St. Louis Co. Cir. Ct., Dec. 2014); *Lampkin v. City of Jennings*, 14SL-CC04207 (St. Louis Co. Cir. Ct., Dec. 2014); *Wann v. City of St. Louis*, 1422-CC10272 (St. Louis City Cir. Ct., Dec. 2014); *Reed v. City of Ferguson*, 14SL-CC04195 (St. Louis Co. Cir. Ct., Dec. 2014); *Eldridge v. City of St. John*, 15SL-00456 (St. Louis Co. Cir. Ct., Feb. 2015); *Watkins v. City of Florissant*, 16SL-CC00165 (St. Louis Co. Cir. Ct., Jan. 2016).  ArchCity Defenders also published an extensive report detailing these practices and policies in the cities of Bel-Ridge, Ferguson, and Florissant in August of 2014.  The report is available at http://www.archcitydefenders.org.

with many of the individuals and families most victimized by Defendant's practices.

196.    The interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

**5.      Rule 23(b)(2)**

197.    Class action status is appropriate because Defendant has acted and refused to act on grounds generally applicable to the Declaratory and Injunctive Classes.

198.    A declaration that Defendant cannot jail people in unconstitutional conditions will apply to each Class member.

199.    Injunctive relief compelling Defendant to comply with Plaintiffs' constitutional rights will similarly protect each member of the Class from being again subjected to the Defendant's unlawful jail conditions.  Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

**6.      Rule 23(b)(3)**

200.    Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate in this case.

201.    The common questions of law and fact listed above are dispositive questions in the case of every member of the Classes.  The question of liability can therefore be determined on a class-wide basis.  Class-wide treatment of liability is a far superior method of determining the content and legality of the Defendant's jail's conditions than individual suits by hundreds or thousands of Defendant's residents.  The question of damages will also be driven by class-wide determinations.

202.    To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was unlawfully jailed.  Determining damages for

individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable records of the length of unlawful incarceration.  If need be, individual hearings on Class-member specific damages based on special circumstances can be held after Class-wide liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Fourteenth Amendment—Deplorable and Unconstitutional Jail Conditions

203.    Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

204.    The unsafe, unsanitary, inhumane, and dangerous conditions of confinement in the St. Ann Jail constitute impermissible punishment unrelated to any criminal judgment.  Even if they had been imposed after valid conviction, the conditions would constitute cruel and unusual treatment. The deplorable and excessively harsh conditions in the Defendant's jail are unnecessary to accomplish any legitimate government objective and shock the conscience of any reasonable person concerned with human dignity and liberty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue the following relief:

a.      Certification of the Declaratory and Injunctive Class and the Damages Class, as defined above;

b.      A declaratory judgment that Defendant violated Plaintiffs' rights by subjecting them to unconstitutional jail conditions;

c.      A judgment compensating the Plaintiffs and others similarly situated for the damages that they suffered as a result of Defendant's unconstitutional and unlawful conduct; and

    d.      An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1595, and any other relief this Court deems just and proper.

Dated:  October 12, 2018         Respectfully submitted,

By:_____/s/ S. Zachary Fayne_____
    S. Zachary Fayne (admitted *pro hac vice*)
    ARNOLD & PORTER KAYE SCHOLER LLP
    Three Embarcadero Center, 10th Floor
    San Francisco, CA 94111
    Tel:  (415) 471-3114
    Fax:  (415) 471-3400
    Zachary.Fayne@arnoldporter.com

    David B. Bergman *(*admitted *pro hac vice*)
    Seth J. Wiener *(*admitted *pro hac vice*)
    John Robinson (admitted *pro hac vice*)
    ARNOLD & PORTER KAYE SCHOLER LLP
    601 Massachusetts Ave., N.W.
    Washington, D.C. 20001
    Tel:  (202) 942-5000
    Fax:  (202 942-5999
    David.Bergman@arnoldporter.com
    Seth.Wiener@arnoldporter.com
    John.Robinson@arnoldporter.com

    Blake A. Strode (MBE #68422MO)
    Michael-John Voss (MBE #61742MO)
    Nathaniel Carroll (MBE #67988MO)
    Sima Atri (MBE #70489)
    John M. Waldron (MBE #70401MO)
    440 North 4th Street, Ste. 390
    Saint Louis, MO 63102
    Tel: (855) 724-2489
    Fax:  (314) 925-1307
    bstrode@archcitydefenders.org
    mjvoss@archcitydefenders.org
    ncarroll@archcitydefenders.org
    satri@architydefenders.org
    jwaldron@archcitydefenders.org

    *Attorneys for Plaintiffs*